UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RICHARD BRIAN RIEVES,

       Plaintiff,

v.                                     CASE NO. 6:19-cv-2219-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his application for a period of disability and disability insurance benefits ("DIB"). Following an administrative hearing held via video on October 30, 2018, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from December 4, 2013, the alleged disability onset date, through December 5, 2018, the date of the ALJ's decision.[2] (Tr. 15-30, 38-58.) Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED**

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 17.)

[2] Plaintiff had to establish disability on or before December 31, 2019, his date last insured, in order to be entitled to a period of disability and DIB. (Tr. 16.)

**and REMANDED**.

## I.     Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff raises two issues on appeal.  First, he argues that the ALJ failed to apply the correct legal standards to the treating opinion of Pedro T. Oliveros, M.D., P.T.  He explains that at steps four and five of the sequential evaluation process, the ALJ failed to account for Dr. Oliveros's opinion that Plaintiff needed to avoid prolonged/repetitive use of his hands and needed to allow for frequent microbreaks and failed to explain why the opinion was not adopted.  Second, Plaintiff argues that the ALJ failed to apply the correct legal standards to Plaintiff's testimony regarding pain and limitations, which was rejected by the ALJ "because of the many examinations that showed normal muscle strength in all extremities and in grip strength, normal gait and station, normal coordination, intact sensation, normal or good range of motion, and no evidence of muscle atrophy."  Plaintiff argues that the ALJ's reason for rejecting his testimony was neither specific nor adequate and that in evaluating his testimony, the ALJ failed to consider any other factors set forth in 20 C.F.R. § 404.1529(c)(3).

Defendant responds that the ALJ properly gave little weight to the limitations opined by Dr. Oliveros because they were vague, unsupported by and inconsistent with the record evidence, and did not explain how functionally limited Plaintiff was.  Defendant adds that Dr. Oliveros did not describe Plaintiff's manipulative limitations in functional terms, did not

define the terms "prolonged" or "repetitive," and did not define the term "microbreaks" or explain how it differs from customary workday breaks. Defendant argues that the ALJ already included manipulative limitations in the residual functional capacity ("RFC") assessment by limiting Plaintiff to frequent handling and fingering, which arguably encompasses Dr. Oliveros's opinion.  As to the second issue on appeal, Defendant argues that the ALJ properly discounted Plaintiff's testimony because it was inconsistent with the objective medical evidence showing mild to moderate examination findings, including Dr. Perdomo's examination findings and the physical therapy notes showing improvement in Plaintiff's pain level.

## A.   Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not

bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

When a claimant seeks to establish disability through his own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam). "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." *Id.*

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

Once a claimant establishes that his pain is disabling through "objective medical evidence from an acceptable medical source that shows . . . a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms," pursuant to 20 C.F.R. § 404.1529(a), "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability," *Foote*, 67 F.3d at 1561. *See also* SSR 16-3p[3] (stating that after the ALJ finds a medically

---

[3] SSR 16-3p rescinded and superseded SSR 96-7p, eliminating the use of the term "credibility," and clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p.

determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the individual's symptoms" to determine "the extent to which an individual's symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.
> . . .
> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[4] The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.
> . . .

---

[4] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

> In evaluating an individual's symptoms, our adjudicators will not
> assess an individual's overall character or truthfulness in the
> manner typically used during an adversarial court litigation. The
> focus of the evaluation of an individual's symptoms should not be
> to determine whether he or she is a truthful person. Rather, our
> adjudicators will focus on whether the evidence establishes a
> medically determinable impairment that could reasonably be
> expected to produce the individual's symptoms and given the
> adjudicator's evaluation of the individual's symptoms, whether
> the intensity and persistence of the symptoms limit the
> individual's ability to perform work-related activities[.]

SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" will also be considered "when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;
- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

## B.    Dr. Oliveros's Records and Opinions

On December 2, 2014, Plaintiff presented to Dr. Oliveros with complaints of low back pain radiating to his bilateral lower extremities with associated paresthesia on the last three toes of his left foot.  (Tr.  816-17.) Plaintiff reported that at times, he was not "able to move or feel those three toes," the pain was "worse with activity, sneezing, lifting, bending and prolonged sitting," and was "better with rest (laying supine) and with PRN [as needed] pain medications."  (Tr. 817.)  Plaintiff also experienced "constant paresthesia and coldness in the middle, ring and little finger of his right hand" and neck discomfort since his lumbar fusion in November of 2014.  (*Id.*)

Dr. Oliveros noted that Plaintiff's musculoskeletal conditions had interfered

with his daily activities and function.  (*Id.*)

> Dr. Oliveros summarized Plaintiff's medical history, in part, as follows:

> [After a motor vehicle accident on December 4, 2013,] [t]he patient complained of low back pain, worse on the left lower lumbar region.  Due to the persistence of his symptoms, he underwent chiropractic care for about 3 months.  The passive treatment only provided him with temporary relief.  Due to the lack of improvement, he consulted a surgeon (Dr. Greenberg) and after discussing his options he decided to undergo a lumbar laminectomy on 03-20-14.  After about a month of improvement, his low back pain returned.  The patient then underwent post-op[erative] physical therapy for about 7 months.  Again, the patient only reported mild and very short-lived benefit from the therapy.  The patient then consulted Dr. Jose Torres, Anesthesiologist, who performed various invasive procedures such as TPIs [i.e., trigger point injections].  He recalls that he responded well to the TPIs.  However, he states that he was discharged from his practice because he could not produce an [sic] urine sample.  The patient then followed up with Dr. Greenberg and on 11-18-14 he had a lumbar fusion with instrumentation.  After the procedure, the patient was unable to feel his legs.  He had to go in for a second procedure on 11-20-14, in which some of the screws were removed.  The sensation in his legs returned except for the lateral aspect of the left foot/toes.  The patient has an appointment tomorrow with the surgeon to discuss post-op[erative] [physical therapy] clearance.  In the meantime, he has been managing his pain with PRN Hydrocodone 5/325[]mg and Methocarbamol 500[]mg.  On the average, he takes 5 of the Hydrocodone and about 3 of the muscle relaxant in a day.

(Tr. 816.)

> Plaintiff's physical examination on December 2, 2014 was normal,

except for decreased sensation to light touch and pinprick in the lateral two

fingers of the right hand with positive Tinel's sign along the ulnar nerve at

the wrist and particularly the elbow; decreased sensation in all toes, especially the lateral three toes; 4+/5 strength of the right little finger abductors; 4/5 strength of the left ankle and toe flexors (he was only able to do one toe raise on the left); 4+/5 strength of the left toe extensors/ankle dorsiflexors; positive Straight Leg Raising/slump test on the left; and diffuse tenderness of the lumbar paraspinals.  (Tr. 818-19.)  Dr. Oliveros diagnosed persistent low back pain status post lumbar fusion with instrumentation and probable right ulnar mononeuropathy.  (Tr. 819.)  Dr. Oliveros refilled Plaintiff's medications, including Hydrocodone 10/325, and encouraged Plaintiff "to remain active as tolerated, but avoid prolonged positioning and frequently change positions for comfort."  (*Id.*)

On April 23, 2015, Plaintiff underwent an electrodiagnostic study of his upper extremities.  (Tr. 824.)  The study showed "electrophysiologic findings of a moderate carpal tunnel syndrome bilaterally, slightly worse on the right," "electrophysiologic findings consistent with bilateral mild ulnar mononeuropathy," and "no electrophysiologic evidence of an active right C5-T1 radiculopathy."  (Tr. 827.)  The following recommendations were made:

> In regard to the bilateral CTS [i.e., carpal tunnel syndrome], recommendations as follows: conservative and surgical intervention.  Trial of conservative care including wrist splints at neutral/zero position, avoid prolonged/repetitive use of the hands, allow for frequent microbreaks, short term NSAID's for 1-2 weeks at a time for exacerbations, [and] off label use of Neurontin or Lyrica.  Though of limited benefit, trial of Vit[amin] B6

11

supplements.  Recommend follow up EMG/NCS in one year to
determine the status of the carpal tunnel syndromes and the
ulnar mononeuropathies.  Advised to try using an elbow cushion
to minimize irritation of the ulnar nerves and avoid prolonged
full elbow flexion.  If conservative treatment fails, consider
surgical interventions.

(Tr. 827-28.)

On June 18, 2015, Dr. Oliveros authored a letter stating that Plaintiff

was under his care for the following musculoskeletal conditions:

1.    Left SI [i.e., sacroiliac] joint dysfunction likely posterior
      torsion[,]
2.    Persistent low back pain [status post] lumbar fusion with
      instrumentation[,]
3.    Probable right ulnar mononeuropathy[,]
4.    Moderate CTS bilaterally[, and]
5.    Mild ulnar mononeuropathy bilaterally[.]

(Tr. 1004.)  The letter also stated:

Despite undergoing low back surgery, though improved,
[Plaintiff] has persistent low [back] pain, interfering with his
function and activities.  The current medication regimen[,] i.e.
Butrans 10 mcg weekly and as needed Hydrocodone 10/325 and
Gabapentin[,] has provided him acceptable pain relief allowing
him to remain functional and perform his exercises.  Except for
constipation, he denies any other adverse or side effects from the
current medications.  He denies cognitive dysfunction[,] such as
drowsiness.  It is medically necessary for him to continue with
the current opioid regimen to be able to remain functional and
return to work.

(*Id.*)

Dr. Oliveros saw Plaintiff multiple times in 2016 – on January 26,

February 18, March 14, April 11, May 9, June 6 and 29, July 27, September

22, October 17, November 17, and December 15.  On January 26, 2016,

Plaintiff reported that his back pain was "worse with sitting, standing and

lifting," was "better with rest, medications and therapy," and he continued to

have "good" days and "bad" days.  (Tr. 754.)  Plaintiff's physical examination

that day was generally normal, except for decreased sensation to light touch

and pinprick in the lateral two fingers of the right hand, with positive Tinel's

sign along the ulnar nerve at the wrist and particularly the elbow; decreased

sensation in all toes, especially the lateral three toes; positive trigger point

with taut bands affecting the left intrascapular muscles; 4+/5 strength of the

right little finger abductors; 4/5 strength of the left ankle and toe flexors (he

was only able to do one toe raise on the left); 4+/5 strength of the left toe

extensors/ankle dorsiflexors; tenderness of the left SI joint area; and a leg

discrepancy (the left leg was shorter than the right leg).  (Tr. 756.)  Dr.

Oliveros diagnosed bilateral moderate CTS; bilateral mild ulnar

mononeuropathies; left SI joint dysfunction, likely posterior torsion;

persistent low back pain status post lumbar fusion with instrumentation;

probable right ulnar mononeuropathy; and opioid induced constipation.  (*Id.*)

Plaintiff was advised to "use the lumbar brace/SI belt PRN for

exacerbations."  (*Id.*)

On February 18, 2016, Plaintiff continued to report "frequent

paresthesia on the ulnar nerve distribution of his hands bilaterally, but

worse on the right." (Tr. 758.) The physical examination findings and diagnoses remained the same as in January. (TR. 760.)

On March 14, 2016, Plaintiff reported an exacerbation of his low back pain, which "was severe enough that he was almost bed-ridden for approximately 2-3 days," and "frequent paresthesia on the ulnar nerve distribution of his hands bilaterally, but worse on the right." (Tr. 762.) The physical examination findings remained the same as in the previous visit, but Plaintiff also had increasing pain with active sitting Straight Leg Raising test on the left. (Tr. 764.) His diagnoses also remained the same, with the additional diagnosis of "[e]xacerbation of [the] [l]eft SI joint disfunction[,] likely anterior torsion." (Tr. 764.)

On April 11, 2016, in addition to his previous complaints, Plaintiff reported bilateral upper extremity paresthesia and noted that his arms would "fall[] asleep" at night. (Tr. 766.) On May 9, 2016, Plaintiff confirmed these complaints. (Tr. 770.) On that day, he underwent another electrodiagnostic study of his upper extremities, which revealed "electrophysiologic findings of a right moderate carpal tunnel syndrome and of a left mild-moderate carpal tunnel syndrome," an "electrophysiologic finding consistent with a mild left ulnar mononeuropathy," and "no electrophysiologic evidence of an active right C5-T1 radiculopathy." (Tr. 777.) The following recommendations were made:

14

> In regard to the bilateral CTS, recommendations as follows: conservative and surgical intervention.  Trial of conservative care including wrist splints at neutral/zero position, avoid prolonged/repetitive use of the hands, allow for frequent microbreaks, [and] short term NSAID's for 1-2 weeks at a time for exacerbations.  Continue the Gabapentin for symptomatic relief.  Though of limited benefit, trial of Vit[amin] B6 supplements.  Recommend follow up EMG/NCS in one year to determine the status of the carpal tunnel syndromes and the ulnar mononeuropathy.

(*Id.*)

On June 6, 2016, Plaintiff reported that even though he had been wearing wrist splints at night, he still experienced persistent paresthesia in both arms and had to frequently reposition himself for comfort, and there was "tenderness along the medial epicondyle bilaterally."  (Tr. 780.)  Dr. Oliveros reviewed the recent electrodiagnostic study with Plaintiff and recommended conservative treatment, unless the CTS remained bothersome, in which case a surgical consultation might be considered, particularly for the right moderate CTS.  (Tr. 783.)  In the meantime, in addition to the wrist splints, he recommended a trial of Voltaren gel to be applied to the wrists and elbows and an increased dose of Gabapentin.  (*Id.*)  Plaintiff was also taking other medications, such as Hydrocodone 10/325.  (*Id.*)

On June 29, 2016, Dr. Oliveros noted that although Plaintiff felt better compared to his initial examination, he was "still unable to return to work due to his pain," because "he could not tolerate an 8-hour workday[,]

15

particularly standing/walking and repetitive lifting." (Tr. 785.) Dr. Oliveros also noted:

> During the interim period, the patient has responded well to Voltaren gel applied to the elbows and the wrists bilaterally. There is less tenderness and soreness around the areas. However, he still has persistent paresthesia in his arms, with nocturnal exacerbations. Every time he tries to lie on either side, he experiences diffuse numbness in the forearms and occasionally into the pectoralis muscles. If he tries to lie supine, the paresthesia is more distally, into the hands. He has been wearing his wrist splints at nighttime and the wrist pain has been less.

(*Id.*) Dr. Oliveros stated that "the paresthesia ha[d] been tolerable but remain[ed] worse at night." (Tr. 788.) He added that if it remained bothersome, a surgical consultation could be considered, particularly for the right moderate CTS. (*Id.*)

On July 27, 2016, Plaintiff complained of pain and swelling in his right knee, along with his other conditions. (Tr. 750.) A cane was recommended along with his usual medications and physical therapy. (Tr. 753.) On September 22, 2016, Plaintiff reported that with the "cervical traction and therapeutic exercises[,] the paresthesia in his hands ha[d] decreased on a temporary basis." (Tr. 842.) On October 17, 2016, Plaintiff made the same statement. (Tr. 849.)

On November 17, 2016, Dr. Oliveros made the following observations:

> The patient continues to have "good" and "bad" days. . . . He has continued with his physical therapy treatment, which enable[s]

16

him to be functional.

He is rating his low back and intrascapular pain at 5/10 today.  It
is a frequent to constant pain worse with prolonged sitting[,]
bending and lifting.  It is better with therapy[,] rest and
medications.
. . .

He has intermittent bilateral knee pain, worse on the right,
associated with crepitation and stiffness, worse with prolonged
standing/walking, kneeling[,] and squatting.

(Tr. 853.)

On physical examination, there was, *inter alia*, tenderness along the
medial joint line in both knees, worse on the right; tenderness in the
peripatellar area; positive trigger point with taut bands affecting the lower
intrascapular muscles, the left QL/gluteus medius, and the left intrascapular
muscles; increased thoracic kyphosis;  4+/5 strength of the right little finger
abductors; 4/5 strength of the left ankle and toe flexors (he was only able to
do one toe raise on the left); 4+/5 strength of the left toe extensors/ankle
dorsiflexors; tenderness of the left SI joint area; and a leg discrepancy.  (Tr.
856.)

Dr. Oliveros diagnosed cervical spondylosis; thoracic spondylosis;
probable right knee degenerative joint disease ("DJD") and patellofemoral
dysfunction; anxiety; persistent low back pain status post lumbar fusion with
instrumentation; intrascapular pain secondary to myofascial pain and
postural syndrome; right moderate CTS and left mild-moderate CTS; left

17

mild ulnar mononeuropathy; left SI joint dysfunction likely anterior torsion;
and opioid induced constipation, resolved.  (*Id.*)  Dr. Oliveros noted, *inter alia*,
that with the cervical traction and therapeutic exercises, the paresthesia in
Plaintiff's hands had decreased on a temporary basis.  (Tr. 857.)

During a follow-up visit on December 15, 2016, Dr. Oliveros made the
following observations:

> During the interim period, [Plaintiff's] pain has somewhat
> increased.  He admits that, due to pain, he has not been as
> compliant with his HEP [i.e., home exercise program] as he
> should have.  Today he is complaining mostly of low back pain
> and intrascapular pain.  His pain is worse with prolonged
> positioning (sitting), bending and lifting.  It is better with rest,
> therapy and by taking his medications.

(Tr. 862.)  On physical examination, some of the abnormal findings included:
decreased sensation to light touch and pinprick in the lateral two fingers of
the right hand with positive Tinel's sign along the ulnar nerve at the wrist
and particularly the elbow; decreased sensation in all toes, but worse on the
lateral three toes; some dizziness with Dix Hallpike's maneuver; tenderness
along the medial joint line in both knees, worse on the right; tenderness in
the peripatellar area; positive trigger point with taut bands affecting the
lower intrascapular muscles, the left QL/gluteus medius, and the left
intrascapular muscles; increased thoracic kyphosis; increasing pain on the
left side with active sitting Straight Leg Raising test; 4+/5 strength of the
right little finger abductors; 4/5 strength of the left ankle and toe flexors (he

18

was only able to do one toe raise on the left); 4+/5 strength of the left toe extensors/ankle dorsiflexors; tenderness of the left SI joint area; and a leg discrepancy.  (Tr. 864-65.)

Dr. Oliveros diagnosed probable benign paroxysmal positional vertigo ("BPPV"); cervical spondylosis; thoracic spondylosis; probable right knee DJD and patellofemoral dysfunction; anxiety; persistent low back pain status post lumbar fusion with instrumentation; intrascapular pain secondary to myofascial pain and postural syndrome; right moderate CTS and left mild-moderate CTS; left mild ulnar mononeuropathy; left SI joint dysfunction likely anterior torsion; and opioid induced constipation, resolved.  (Tr. 865.) Plaintiff's medications were re-filled, and he was provided a prescription for cervical traction, but he was waiting for his insurance to approve it.  (Tr. 866.)  Plaintiff reported that physical therapy had been helpful and that with the cervical traction and therapeutic exercises, the paresthesia in his hands had decreased on a temporary basis.  (*Id.*)

## C.    The ALJ's Decision

The ALJ found at step two of the sequential evaluation process[5] that Plaintiff had the following severe impairments: degenerative disc disease of

---

[5] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4).

the lumbar spine status-post-surgery, cervical spondylosis, bilateral carpal tunnel syndrome, anxiety, depression, and post-traumatic stress disorder ("PTSD"). (Tr. 18.) Further, the ALJ found that Plaintiff had the RFC to perform a range of light work[6] with the following limitations:

> [The claimant] is limited to occasional climbing of stairs and ramps and never climbing ladders or scaffolds. The claimant is limited to occasional balancing, stooping, kneeling, crouching, and crawling. He can frequently[,] but not constantly[,] perform fingering and handling bilaterally. The claimant can have no exposure to industrial types of vibration. He needs to avoid concentrated exposure to hazards, such as unprotected heights and moving mechanical parts. The claimant is limited to understanding, remembering, and carrying out simple instructions. He can tolerate occasional interaction with supervisors, coworkers, and the public. The claimant can only make simple, work-related decisions and tolerate only occasional change in work location. He is unable to work at a strict production rate, like the type of rate required to work on an assembly line.

(Tr. 20.)

In making this finding, the ALJ discussed Plaintiff's subjective complaints, the objective medical findings, and the records and opinions of treating, examining, and non-examining sources. (Tr. 20-27.) The ALJ addressed Plaintiff's testimony as follows:

> At the hearing, the claimant testified he is unable to work because of back pain. He testified that he has problems with

---

[6] By definition, light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; it requires a good deal of walking, standing, or sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b); SSR 83-10.

standing, walking, and sitting in an office chair. The claimant
stated [that] with pain medication he could walk about 100 feet
and sit for approximately 45 minutes maximum. He testified he
could lift 10 pounds.

Additionally, the claimant complained of problems with
concentration, memory, understanding, following instructions,
completing tasks, and getting along with others (Exhibits 6E and
11E). He reported symptoms such as chest tightness, sweaty
palms, confusion, lightheadedness, and pain that radiated from
his back to his legs (Exhibits 3E and 5E).

(Tr. 21.)

After addressing the medical evidence, the ALJ found that Plaintiff's

statements about his functional limitations were not entirely consistent with

the medical and other evidence in the record. (Tr. 24.) The ALJ explained:

The imaging studies showing the claimant had degenerative disc
disease of the lumbar spine and cervical spondylosis support[]
limiting the claimant to light work (Exhibits 2F, 3F, 4F, 8F-12F,
14F, 20F, 21F, and 38F). Additionally, the fact the claimant had
multiple lumbar surgeries[,] as well as periodic abnormalities[,]
such as tenderness and decreased range of motion to [sic] the
cervical and lumbar spine, decreased sensation to the lower
extremity, positive straight leg raise, paraspinal muscle spasms,
and antalgic gait[,] supports limiting the claimant to light work
with the postural and environmental limitations described in the
[RFC] (Exhibits 5F, 6F, 7F, 9F, 10F, 11F, 28F-31F and []36F).
Furthermore, the EMG study revealing carpal tunnel syndrome
and the occasional examinations showing positive Tinel's and
abnormal sensation in the hands, wrists, and/or elbows supports
the manipulative limitations (Exhibits 7F, 9F, 10F, 16F, 30F,
31F, and 36F). Nevertheless, additional or greater limitations
are not supported because of the many examinations that showed
normal muscle strength in all extremities and in grip strength,
normal gait and station, normal coordination, intact sensation,
normal or good range of motion, and no evidence of muscle
atrophy (Exhibits 2F-6F, 9F, 10F, 16F, 17F, 19F, 22F, 28F-31F,

21

and 34F-36F).

(Tr. 24-25.)

The ALJ then addressed the medical opinion evidence.  (Tr. 25-27.)

The ALJ stated:

> The claimant's doctor, Jonathan Greenberg, M.D., opined []he
> needed to be off [work for] six weeks and upon return to work was
> restricted to lifting 10 to 20 pounds (Exhibits 2F-4F and 14F).
> His chiropractor, Mark Boylan, D.C., opined he needed to avoid
> body positions and exertions that contributed to physical stress
> and increased his symptoms (Exhibit 1F).  Another provider,
> Pedro T. Oliveros, Jr., M.D., opined the claimant needed to take a
> prescribed opioid regimen to remain functional and return to
> work (Exhibits 30F and 36F).  The treatment notes from
> Francisco Rodriguez, M.D., often indicated the claimant was
> impaired from work/school (Exhibit 25F).
>
> The consultative examiner, Dr. Perdomo, opined the claimant
> could stand and walk for four hours in an eight-hour day with
> normal breaks as well as sit for four to six hours in an eight-hour
> day with normal breaks (Exhibit 17F).  Dr. Perdomo opined the
> claimant could occasionally lift and carry no more than 25 pounds
> (*Id.*).  He opined the claimant should avoid repetitive bending,
> stooping, and crouching but did not require an assistive device for
> ambulation (*Id.*).

(Tr. 25.)

The ALJ found that Dr. Perdomo's opinions were entitled to "some

weight" because:

> These opinions are somewhat consistent with the evidence as [a]
> whole.  The medical evidence showed the claimant had
> degenerative disc disease of the lumbar spine that required
> surgical intervention that supports limiting the claimant to light
> work with the postural and environmental limitations described
> in the [RFC] above (Exhibits 1F-4F, 7F, 9F-11F, 14F, 29F-31F

22

and 34F-36F).  Moreover, the examination findings[,] showing tenderness to palpation of the cervical and lumbar spine, decreased sensation in the left lower extremity, and occasional limited range of motion and positive straight leg [raising test,] support[] light work and the postural and environmental restrictions (Exhibits 1F-6F, 9F, 10F, 14F, 16F, 19F, 23F, and 28F).  However, the[] opinions are entitled to only some weight because the evidence supports finding additional or greater limitations.  For example, an EMG revealed bilateral carpal tunnel syndrome and examinations showed episodes of decreased sensation or positive Tinel's sign in the hands, wrists, and/or elbows (Exhibits 1F, 2F, 3F, 7F, 9F, 10F, 16F, 29F-31F, and 34F-36F).

(Tr. 25-26.)

Then, the ALJ gave "little weight" to the opinions of Dr. Greenberg, Dr. Boylan, Dr. Oliveros, and Dr. Rodriguez for the following reasons:

These opinions are entitled to little weight because they are not consistent with the evidence as a whole.  First, the opinion from Dr. Greenberg appeared to be temporary in nature (Exhibits 2F-4F and 14F).  Second, the opinions from Dr. Boylan and Dr. Oliveros are vague and do not provide any explanation of how the claimant is functionally limited (Exhibits 1F, 30F, and 36F).  Third, the opinion from Dr. Rodriguez is also vague and does not provide any functional limitations nor does the opinion explain what causes the claimant to be impaired from those activities (Exhibit 25F).  Fourth, the evidence does not support their opinions because multiple examinations showed the claimant had normal muscle strength, normal motor function, normal muscle bulk or tone, intact sensation, normal range of motion, and a normal gait, station, and coordination (Exhibits 3F, 5F, 6F, 7F, 9F-11F, 16F, 17F, 19F, 22F, 28F-31F, and 34F-36F).  Additionally, some of the opinions address issues reserved to the Commissioner, i.e., whether the claimant is disabled and the claimant's ability to work (20 CFR § 404.1527(d)).

(Tr. 26.)

23

The ALJ concluded that the RFC assessment was "supported by the imaging studies, the objective findings, the mental status examinations, the claimant's statements to his treating providers, and the impressions and assessments reported by the medical professionals." (Tr. 27.) Then, at step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id.*) However, at the fifth and final step of the sequential evaluation, the ALJ determined, after considering Plaintiff's age, education, work experience, RFC, and the testimony of the Vocational Expert ("VE"), that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as a mailroom clerk, an office assistant, and a routing clerk. (Tr. 28-29.) All of these representative occupations are light, unskilled, with a Specific Vocational Preparation ("SVP") of 2. (*Id.*)

### D.   Analysis

The Court agrees with Plaintiff that the ALJ's failure to account for (or properly discount) Dr. Oliveros's opinion warrants a remand. On April 23, 2015 and May 9, 2016, based on the results of electrodiagnostic tests that took place on the same dates, Dr. Oliveros opined that Plaintiff needed to avoid prolonged/repetitive use of the hands and to allow for frequent microbreaks. (Tr. 777, 827-28.) The ALJ did not consider this opinion and did not seem to incorporate it in the RFC assessment which, *inter alia*, limited Plaintiff to "frequent[] . . . fingering and handling bilaterally." (Tr.

24

20.)  In the decision, the ALJ mentioned, and accorded "little weight" to,
another opinion by Dr. Oliveros, namely, that it was medically necessary for
Plaintiff to continue with his current opioid regimen to be able to remain
functional and to return to work.  (Tr. 25-26 (stating that this opinion was
entitled to little weight because it was vague and did not provide any
explanation of how functionally limited Plaintiff was); Tr. 1004.)

In light of the ALJ's consideration of Dr. Oliveros's opinion as to
Plaintiff's opioid regimen, Defendant urges the Court to affirm the ALJ's
decision and argues that the reasons for discounting one of Dr. Oliveros's
opinions would apply with full force to the other opinion regarding avoiding
prolonged/repetitive use of the hands and allowing for frequent microbreaks.
It seems that Defendant urges the Court to accept a *post hoc* rationalization
for affirming the administrative decision.  (*See* Doc. 22 at 10.)  However, the
Court cannot do so.  *See SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1964) ("[A]
simple but fundamental rule of administrative law . . . [is] that a reviewing
court, in dealing with a determination or judgment which an administrative
agency alone is authorized to make, must judge the propriety of such action
solely by the grounds invoked by the agency.").

However, assuming *arguendo* that the ALJ intended to cite the same
reasons for not crediting any of Dr. Oliveros's opinions, those reasons are not
supported by substantial evidence.  Dr. Oliveros's opinion that Plaintiff

needed to avoid prolonged/repetitive use of the hands and to allow for frequent microbreaks speaks directly about Plaintiff's functional limitations, is not on an issue reserved to the Commissioner, and does not seem to be vague.  Moreover, this opinion is supported by the evidence of record, including the electrodiagnostic tests that took place on the same dates, the examination findings and impressions, and Plaintiff's statements to his treating providers.

For example, Plaintiff regularly reported "constant paresthesia and coldness in the middle, ring and little finger of his right hand" and/or "persistent paresthesia in both arms," despite treatment, and noted that his arms would "fall[] asleep" at night.  (Tr. 766, 770, 780, 785, 788, 817; *see also* Tr. 758, 762; *but see* Tr. 842, 849, 857, 866 (noting that the paresthesia in the hands had decreased temporarily).)  His complaints were confirmed on physical examination, which consistently showed decreased sensation to light touch and pinprick in the lateral two fingers of the right hand with positive Tinel's sign along the ulnar nerve at the wrist and elbow and diminished strength of the right little finger abductors, among other abnormal findings. (Tr. 756, 760, 764, 818-19, 856, 864-65.)

The electrodiagnostic study of Plaintiff's upper extremities from April 23, 2015 showed "moderate carpal tunnel syndrome bilaterally, slightly worse on the right" and "bilateral mild ulnar mononeuropathy."  (Tr. 827.)  The

electrodiagnostic study from May 9, 2016 revealed "a right moderate carpal tunnel syndrome," "a left mild-moderate carpal tunnel syndrome," and "a mild left ulnar mononeuropathy." (Tr. 777.) Dr. Oliveros's opinion was based on the results of these electrodiagnostic tests and was consistent with Plaintiff's reported complaints and examination findings.

Defendant states that "the ALJ already included manipulative limitations in the RFC finding, limiting Plaintiff to frequent, but not constant, handling and fingering bilaterally, which would account for any limitation to 'prolonged and repetitive use of the hands,' arguably encompassing any manipulative limitation opined by Dr. Oliveros." (Doc. 22 at 10.) Even if the Court could speculate whether the RFC assessment encompasses Dr. Oliveros's opinion as to the need to avoid prolonged/repetitive use of the hands, there is no indication that the ALJ either took into account or properly discounted the other part of Dr. Oliveros's opinion pertaining to the need to take frequent microbreaks.

Based on the foregoing, a remand is appropriate so the ALJ may reconsider Dr. Oliveros's opinions. In light of this conclusion, the Court need not separately address Plaintiff's second argument. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per

curiam).  However, on remand, the ALJ should also reconsider Plaintiff's testimony regarding pain and limitations.

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to: (a) reconsider the opinions of Dr. Oliveros, explain what weight they are being accorded, and the reasons therefor; (b) reconsider Plaintiff's testimony regarding pain and limitations; (c) reconsider the RFC assessment, if necessary; and (d) conduct any further proceedings deemed appropriate.

2.     The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.     In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on March 2, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record